**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

AES TECHNOLOGIES, LLC,                              Case No.: 3:14-bk-05397-PMG

AUTOMOTIVE ELECTRONIC                          Case No.: 3:14-bk-05400-PMG
SOLUTION PROVIDERS, LLC,

                                                              (Jointly Administered under Case
              Debtors.                                       No. 3:14-bk-05397-PMG)
_____/              Chapter 11

**NOTICE OF FILING AFFIDAVIT OF BRENT C. WILLIAMS**
**IN SUPPORT OF (I) CONFIRMATION OF JOINT PLAN OF LIQUIDATION**
**OF THE DEBTORS AND (II) THE SALE OF SUBSTANTIALLY**
**ALL OF THE DEBTORS' ASSETS TO THE PURCHASER**

AES Technologies, LLC and Automotive Electronic Solution Providers, LLC, chapter 11

debtors herein (collectively, the "Debtors"), by and through their undersigned counsel, give

notice of filing the Affidavit of Brent C. Williams in Support of (i) Confirmation of Joint Plan of

Liquidation of the Debtors and (ii) the Sale of Substantially All of the Debtors' Assets to the

Purchaser.

Dated: July 20, 2015                              AKERMAN LLP

                                                  By: /s/ Jacob A. Brown
                                                      Jacob A. Brown
                                                      Florida Bar No.: 0170038
                                                      Email: jacob.brown@akerman.com
                                                      Katherine C. Fackler
                                                      Florida Bar No.: 0068549
                                                      Email: katherine.fackler@akerman.com
                                                      50 North Laura Street, Suite 3100
                                                      Jacksonville, FL 32202
                                                      Telephone: (904) 798-3700
                                                      Facsimile: (904) 798-3730

                                                      and

Steven R. Wirth
Florida Bar Number: 170380
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602-5250
Telephone: (813) 223-7333
Facsimile: (813) 223-2837
Email: steven.wirth@akerman.com

*Attorneys for the Debtors*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was furnished this 20th day of July, 2015, either by electronic notification or U.S. mail, postage prepaid and properly addressed, to:

Scott E. Bomkamp, Esq.
United States Department of Justice
Office of the United States Trustee
George C. Young Federal Building
400 W. Washington Street, Suite 1100
Orlando, FL 32801

John R. Smith, Jr., Esq. and
Christopher H. Henderson, Esq.
Smith Hulsey & Busey
225 Water Street Suite 1800
Jacksonville, FL 32202

Vicki R. Harding, Esq.
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI 48075-1505

Timothy Danninger, Esq.
Gunster Yoakley & Stewart, P.A.
225 Water Street, Suite 1750
Jacksonville, FL 32202

James A. Bledsoe, Jr., Esq.
Bledsoe, Jacobson, Schmidt, Wright,
   Wilkinson & Sussman
1301 Riverplace Boulevard, Suite 1818
Jacksonville, FL 32207

Kenneth B. Wright, Esq.
Jacobson & Wright, P.A.
1301 Riverplace Boulevard, Suite 1818
Jacksonville, FL 32207

Michael E. Demont, Esq.
Smith Hulsey & Busey
225 Water Street Suite 1800
Jacksonville, FL 32202

Brent C. Williams
Teneo Securities LLC
601 Lexington Ave., 45th Floor
New York, NY 10022

Michael J. Marees, Esq.
Joseph & Marees, P.A.
4035 Atlantic Blvd.
Jacksonville, FL 32207

Michael S. Waskiewicz, Esq.
Rogers Towers, P.A.
1301 Riverplace Boulevard, Suite 1500
Jacksonville, FL 32207

{34821709;1}

2

Andrew V. Layden, Esq.
Baker & Hostetler LLP
Suntrust Center - Suite 2300
200 S. Orange Avenue
Orlando, FL 32801

Elazar Guttman, Esq.
David S. Meyer, Esq.
Jessica T. Murray, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Paul Steven Singerman, Esq.
Jordi Guso, Esq.
Berger Singerman, P.A.
1450 Brickell Avenue, 19th Floor
Miami, FL 33131

*/s/ Jacob A. Brown*
Attorney

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

AES TECHNOLOGIES, LLC,

AUTOMOTIVE ELECTRONIC
SOLUTION PROVIDERS, LLC,

                Debtors.

_____/

Case No.: 3:14-bk-05397-PMG

Case No.: 3:14-bk-05400-PMG

(Jointly Administered under Case
No. 3:14-bk-05397-PMG)

Chapter 11

**AFFIDAVIT OF BRENT C. WILLIAMS IN SUPPORT OF (I) CONFIRMATION
OF JOINT PLAN OF LIQUIDATION OF THE DEBTORS AND (II) THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO THE PURCHASER**

STATE OF NEW YORK
COUNTY OF NEW YORK

      Before me, the undersigned authority, personally appeared Brent C. Williams who being

duly sworn, deposes and says:

      1.    I am the Court-appointed Chief Restructuring Officer of the Debtors (the "CRO") in

the above-captioned chapter 11 cases.  I am over 21 years of age and fully competent to make this

Affidavit.   Unless otherwise stated, I have personal knowledge of the facts set forth herein.

      2.    I make this Affidavit in support of (i) confirmation of the Joint Plan of Liquidation

of the Debtors (Doc. 121) (the "Plan") and (ii)  *Motion for an Order (A) Authorizing the Sale of*

*the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B)*

*Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired*

*Leases, (C) Approving Form and Manner of Notices and (D) Granting Related Relief* (Doc. 118),

each filed with the Court on June 3, 2015 (the "Sale Motion").  Defined terms from the Plan are

incorporated herein by reference.

{34528195;4}

3.    As the CRO, I am familiar with the business, operations and assets of the Debtors. My duties include overseeing the Debtors' operations, and reviewing the Debtors' financials, monthly operating reports, and cash flow projections.

4.    I am also familiar with and participated in, the negotiations leading to, and the terms and conditions of the Plan, the amended disclosure statement dated June 23, 2015 (Doc. 143) (the "Disclosure Statement"), and the documents related thereto, including the Purchase Agreement embodied in the Sale Motion.  I also worked closely with the Debtors' counsel in preparing the liquidation analysis in the Disclosure Statement and the treatment of Claims and Interests under the Plan.

**A.    Case Overview, Plan and Sale Motion**

5.    AEST was formed on or about October 31, 2010.  AEST holds a patent for certain automotive technology that AESP uses to, *inter alia*, allow independent vehicle repair shops, fleets, dealers and most aftermarket service chains throughout the United States to provide cost-efficient service to vehicle control modules.

6.    AESP was formed on or about October 17, 2011.  It is a wholly-owned subsidiary of AEST, and acts as AEST's operating entity.  More information on the Debtors can be found at www.aesmodules.com.    The Debtors' principal address is 4887 Belfort Road, Suite 400, Jacksonville, Florida, which is leased from Discovertec, LLC.

7.    As a result of cash flow problems, a threatened foreclosure by a secured creditor and a significant judgment entered against them, the Debtors filed for chapter 11 relief with this Court on October 31, 2014 (the "Petition Date").

8.    In sum, the Plan provides for a liquidation of the Debtors' assets for the benefit of all creditors and stakeholders of the Debtors.  The Plan includes the following principal features:

The Debtors' assets will be sold free and clear of all interests, liens, claims, and encumbrances with interests, liens, claims, and encumbrances either being satisfied at closing or attaching to the net proceeds realized from the sale pursuant to the procedures stated in the Plan and the Sale Motion.

9.    The sale embodied in the Purchase Agreement provides for the Debtors to sell the Transferred Assets to Repairify, LLC, a third party purchaser (the "Purchaser") in exchange for (i) $4 million of cash, (ii) 4,500,000 Series B Preferred Units in the Purchaser's holding company ("Parent") (with a preferred capital value of $4.5 million) and (iii) 1,500,000 Class A Common Units in Parent (out of 10,500,000 Class A Common Units issued as of the Closing Date) (collectively, (ii) and (iii) are referred to as the "Securities").   In connection with the Purchase Agreement, Parent has committed to provide $4.5 million of working capital to the Purchaser to ensure that it is appropriately capitalized to operate the Purchaser's business.

10.    After being used to pay all allowed claims in full, the Sale Proceeds, including the Securities, will be transferred to a Liquidating Trust which will, among other things, liquidate the Trust Assets, resolve all Disputed Claims and Disputed Interests and prosecute any potential Litigation Claims held by the Debtors.  Each holder of an Allowed Class 6 Claim (together with AEST Bridge Lending, LLC, when it finalizes the conversion of its Class 2 Claim to Class A Membership Units in AEST) will be entitled to receive, in exchange for its Allowed Class 6 Interest, Beneficial Shares in the Liquidating Trust in the manner set forth herein and in the Plan. The projected waterfall of distributions to holders of Class 6 Interests is attached as Exhibit B to the Amended Disclosure Statement.

**C.    Treatment of Creditors and Interest Holders[1]**

11.    Administrative Expense Claims (Unclassified).    All Allowed Administrative Expense Claims will be paid in full, in Cash, as soon as practicable after the Effective Date of the Plan.

12.    Priority Tax Claims (Unclassified).    Except to the extent that the holder of an Allowed Priority Tax Claim agrees to a different treatment, the Liquidating Trustee shall pay each holder of an Allowed Priority Tax Claim the amount of such Allowed Priority Tax Claim in full, in Cash, on the Effective Date, or as otherwise agreed between the Liquidating Trustee and the Priority Tax Claim Holder.

13.    Class 1 (Secured Claim of Stache).    Class 1 consists of the Stache Claim.    Upon transfer of the Transferred Assets to the Purchaser, the Lien securing the Stache Claim shall attach to the Sale Proceeds.    An amount of the Sale Proceeds sufficient to satisfy the Stache Claim, including accrued but unpaid interest and fees in accordance with the Stache Note, shall be paid to Stache, upon closing of the Sale, in full satisfaction, settlement, release, and discharge of the Stache Claim.    Thus, the Stache Claim shall be paid in full.

14.    Class 2 (Secured Claim of the DIP Lender).    Class 2 consists of the DIP Lender Claim.    Upon transfer of the Transferred Assets to the Purchaser, the Lien securing the DIP Lender Claim shall attach to the Sale Proceeds.    An amount of the Sale Proceeds sufficient to satisfy the DIP Lender Claim, including accrued but unpaid interest and fees in accordance with the DIP Loan Documents (less the amount of the DIP Lender Claim, if any, that is converted into Class A Voting Units in accordance with the terms of the DIP Loan Documents), shall be paid to

---

[1] The treatment set forth below is a summary only.  Reference to the Plan should be made for the complete terms of treatment.

the DIP Lender, on or shortly after closing of the Sale, in full satisfaction, settlement, release, and discharge of the DIP Lender Claim.  Thus, the DIP Lender Claim shall be paid in full.

15.  <u>Class 3 (Secured Claim of ROK Properties)</u>.  Class 3 consists of the ROK Properties Claim.  Upon transfer of the Transferred Assets to the Purchaser, the Lien securing the ROK Properties Claim shall attach to the Sale Proceeds.  An amount of the Sale Proceeds sufficient to satisfy the ROK Properties Claim, including accrued but unpaid interest and fees in accordance with the ROK Properties Judgment, shall be paid to ROK Properties, as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of the ROK Properties Claim.  Thus, the ROK Properties Claim shall be paid in full.  Additionally, ROK Properties shall retain all tangible property in its possession as of the Petition Date, and any tangible property not in ROK Properties' possession shall be deemed the Assets of the Debtors and will be sold to the Purchaser under the Purchase Agreement.

16.  <u>Class 4 (Other Priority Claims)</u>.  Class 4 consists of all Other Priority Claims against the Debtors.  A holder of an Allowed Class 4 Claim will receive a Cash payment equal to the amount of its Allowed Class 4 Claim in full satisfaction, settlement, release and discharge of its Allowed Class 4 Claim.  Thus, holders of Allowed Class 4 Claims shall be paid in full.

17.  <u>Class 5 (General Unsecured Claims)</u>.  Class 5 consists of all General Unsecured Claims against the Debtors.  On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Class 5 Claim, shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 5 Claim, the amount of their Allowed Class 5 Claim, without post-Petition Date interest, unless specifically claimed and asserted at a non-default contractual rate with supporting documents.  Thus, holders of Allowed Class 5 Claims shall be paid in full.

18. <u>Class 6 (Interests and Subordinated Claims)</u>.  Class 6 consists of all Interests and Subordinated Claims against the Debtors.  On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Class 6 Interest shall be entitled to receive, in exchange for such Allowed Class 6 Interest, a number of Beneficial Shares equal to the sum of (i) one Beneficial Share for each dollar ($1.00) in such holder's AEST Capital Account Balance as of the Confirmation Date, plus (ii) a pro rata share, based on such holder's percentage interest in AEST, of any remaining Beneficial Shares to be issued by the Liquidating Trust after distribution to all holders of Class 6 Interests pursuant to Clause (i) above.

## **REQUIREMENTS FOR CONFIRMATION SATISFIED**

19. All of the requirements for Confirmation under 11 U.S.C. § 1129 have been satisfied.  Confirmation of the Plan is in the best interests of the Debtors' estates, creditors, and all other parties in interest.

**D.**    **Plan Compliance - 11 U.S.C. § 1129(a)(1)**

20. The Plan and plan modifications and additions comply with the applicable provisions of the Bankruptcy Code, including without limitation 11 U.S.C. §§ 1122, 1123, 1125, and 1129(a) and (b), with respect to all Classes of Claims under the Plan and, therefore, the provisions of 11 U.S.C. § 1129(a)(1) have been satisfied.

**E.**    **Proponent Compliance - 11 U.S.C. § 1129(a)(2)**

21. The Debtors, the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(2) have been satisfied.

**F.**     **Good Faith - 11 U.S.C. § 1129(a)(3)**

22.   The Plan has been proposed in good faith and not by any means forbidden by law. Accordingly, the requirements of 11 U.S.C. § 1129(a)(3) have been satisfied.

**G.**     **Payment of Professionals - 11 U.S.C. § 1129(a)(4)**

23.   Any payments made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with these chapter 11 cases, or in connection with the Plan and incident to these chapter 11 cases, have been approved by, or are subject to the approval of, this Court as reasonable.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(4) have been satisfied.

**H.**     **Officers/Directors - 11 U.S.C. § 1129(a)(5)**

24.   On the Confirmation Date, I shall remain as CRO and shall be authorized to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  My continued employment as the Debtors' CRO (and as the Liquidating Trustee of the Liquidating Trust) is consistent with the interests of creditors and equity security holders and with public policy.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(5)(A) have been satisfied.

**I.**     **Governmental Approval - 11 U.S.C. § 1129(a)(6)**

25.   No governmental regulatory commission has jurisdiction over the rates of the Debtors post-confirmation.  Accordingly, 11 U.S.C. § 1129(a)(6) is not applicable.

**J.**     <u>**Best Interests of Creditors - 11 U.S.C. § 1129(a)(7)**</u>

26.  The Plan treats Classes 1 through 5 as Unimpaired, and pursuant to 11 U.S.C. § 1126(f) Classes 1 through 5 are deemed to have accepted the Plan.  Accordingly, 11 U.S.C. § 1129(a)(7) does not apply to Classes 1 through 5.

27.  The Plan treats Class 6 (Interests and Subordinated Claims) as Impaired.  62.5% of all holders of Class 6 Interests, holding 79.31% of the equity interests in the Debtors, have voted in favor of the Plan.  Therefore, pursuant to 11 U.S.C. 1126(d), Class 6 has accepted the Plan.

28.  With each Impaired Class of Claims or Interests, each holder of an Interest or Claim has either accepted the Plan, consented to the Plan, or will receive or retain, under the Plan on account of such claim or interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.  Based on the foregoing, the requirements of 11 U.S.C. § 1129(a)(7) have been satisfied with respect to each Impaired Class of Claims or Interests.

**K.**     <u>**Acceptance or Rejection of Plan - 11 U.S.C. § 1129(a)(8)**</u>

29.  Classes 1 through 5 are Unimpaired under the Plan, and pursuant to 11 U.S.C. § 1126(f) are deemed to have accepted the Plan.  Class 6 Interest holders are Impaired under the Plan and have voted to accept the Plan.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(8) have been satisfied with respect to each Class of Claims or Interests.

**L.**     <u>**Priority Claims - 11 U.S.C. § 1129(a)(9)**</u>

30.  The Plan provides that all Allowed Unsecured Priority Claims and Allowed Administrative Claims are to be paid on the Effective Date or as soon as practicable thereafter, the date on which such claims becomes payable pursuant to Final Order of the Court, or as

otherwise provided in the Plan.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(9) have been satisfied.

**M.      Acceptance by Impaired Class - 11 U.S.C. § 1129(a)(10)**

31.  Class 6, the only impaired class, accepted the Plan.  Accordingly, the requirements of  11 U.S.C. § 1129(a)(10) have been satisfied.

**N.      Feasibility - 11 U.S.C. § 1129(a)(11)**

32.  The Plan is a liquidating plan.  The Plan is feasible because, *inter alia*, (i) the Debtors are cash flow positive, (ii) the Debtors have been able to meet their financial obligations during the pendency of these chapter 11 cases and (iii) upon the Closing of the Sale, the Debtors can make payments to creditors with Allowed Claims and Allowed Interests as provided under the Plan with the Sale Proceeds from the Transferred Assets.  Thus, confirmation of the Plan is not likely to be followed by any further liquidation or the need for further financial reorganization of the Debtors under the Plan, except to the extent proposed in the Plan. Accordingly, the requirements of 11 U.S.C. § 1129(a)(11) have been satisfied.

**O.      U.S. Trustee Fees - 11 U.S.C. § 1129(a)(12)**

33.  The Plan provides for payment in full of all U.S. Trustee fees payable under 28 U.S.C. § 1930 and all fees payable under Section 1930 of Title 28.  To the extent any fees remain due and owing, they will be paid on the later of (i) the Effective Date of the Plan, and (ii) the due date for such fees under the regular schedule set forth by the United States Trustee.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(12) have been satisfied.

**P.      Retiree Claims - 11 U.S.C. § 1129(a)(13)**

34.  The Debtors have no obligation to provide retiree benefits.  Accordingly, 11 U.S.C. § 1129(a)(13) is not applicable.

**Q.**   **Domestic Support Obligations - 11 U.S.C. § 1129(a)(14)**

35.   The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligation.  Accordingly, 11 U.S.C. § 1129(a)(14) is not applicable.

**R.**   **Non-Individual Debtors – 11 U.S.C. § 1129(a)(15)**

36.   The Debtors are not individuals.   Accordingly, 11 U.S.C. § 1129(a)(15) is not applicable.

**S.**   **Transfers of Property - 11 U.S.C. § 1129(a)(16)**

37.   The Plan does not involve the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  Accordingly, 11 U.S.C. § 1129(a)(16) is not applicable.

**T.**   **11 U.S.C. § 1129(b)(1)**

38.   All of the applicable requirements of subsection (a) of this 11 U.S.C. § 1129 have been met with respect to the Plan.  Therefore, 11 U.S.C. § 1129(b)(1) is inapplicable.

**U.**   **Avoidance of Taxes – 11 U.S.C. § 1129(d)**

39.   Neither the avoidance of taxes nor the avoidance of Section 5 of the Securities Act of 1933 is a principal purpose of the Plan.

**THE SALE OF THE TRANSFERRED ASSETS TO PURCHASER IS IN BEST INTERESTS OF CREDITORS AND STAKEHOLDERS OF THE DEBTORS**

**A.**   **Teneo Security LLC's Marketing Efforts Leading to the Asset Purchase Agreement and Contribution Agreement**

40.   Since the Petition Date, I, along with Teneo Securities LLC ("Teneo"), as Financial Advisor to the Debtors, and the principals of the Debtors, have worked tirelessly to streamline the Debtors' operations and market the Transferred Assets for sale for the benefit of all creditors and stakeholders of the Debtors.

41. In order to develop expectations regarding the value of the Transferred Assets, Teneo and I, among other things: (i) reviewed internal financial information and other data relating to the Debtors' business and financial prospects, including estimates and financial forecasts regarding the continued operation of the Debtors' business as a going concern; (ii) reviewed financial and other data with respect to certain companies in lines of business Teneo believed to be generally comparable to those of the Debtors; and (iii) conducted such other financial studies, analyses and investigations, and considered such other information, as we deemed necessary or appropriate.

42. In an effort to determine whether any potential purchaser would view the Transferred Assets as an acquisition opportunity, Teneo and I conducted a comprehensive, structured sale process of the Assets. The sale process was designed and implemented to result in an acquisition transaction with the highest value to the Debtors' bankruptcy estates. The sale process consisted of three stages. First, Teneo and I compiled a list of potential strategic and financial purchasers. Second, each potential purchaser indicating it was interested in pursuing an acquisition of the Assets was asked to submit a preliminary indication of interest. These preliminary indications of interest were based upon each potential purchaser's preliminary examination of the Transferred Assets, which was prior to the potential purchaser's conducting extensive financial and legal due diligence. After receipt of preliminary indications of interest, Teneo and I identified potential purchasers that would have the opportunity to conduct more extensive due diligence. Third, after conducting due diligence, any potential purchaser interested in pursuing an acquisition submitted an acquisition proposal, which included the material terms of an acquisition transaction (including the purchase price and the material conditions to the proposal). Following the third stage, Teneo and I assessed the proposals submitted by the final

bidders, consulted the Debtors' professionals regarding the proposals (including the purchase price and the conditions of the proposals), considered the alternatives to an asset sale and determined whether to proceed with negotiations concerning the sale of the Transferred Assets.

43.  Teneo and I identified and contacted 187 (95 strategic and 92 financial) potential Purchasers.  Of the 187 potential purchasers contacted, 15 indicated an interest in pursuing a transaction.  Teneo delivered additional information regarding the Transferred Assets to each potential purchaser via access to an online data room.

44.  From September 28, 2014 until March 31, 2015, Teneo and I held discussions with each of the 15 potential purchasers.  Of these 15 potential purchasers, Teneo and I received two preliminary indications of interest to purchase the Transferred Assets for approximately $5 to $7 million.  In addition to stating a preliminary purchase price, the two preliminary indications of interest proposed a transaction that would be financed with cash on hand, debt financing, equity financing or a combination thereof.  Each preliminary indication of interest was non-binding and subject to conditions, including the satisfactory completion of financial and legal due diligence, the attainment of satisfactory financing and the negotiation of a definitive asset purchase agreement.

45.  As a result of these efforts, Teneo and I received two detailed proposals to acquire the Transferred Assets.  Because the Purchaser's proposal was superior, Teneo pursued further discussions with the Purchaser.  After completing its financial due diligence, the Purchaser agreed to purchase substantially all of the Debtors' assets in exchange for (i) $4 million of cash, (ii) 4,500,000 Series B Preferred Units in Parent (with a preferred capital value of $4.5 million) and (iii) 1,500,000 Class A Common Units in Parent (out of 10,500,000 Class A Common Units issued as of the Closing Date).  In connection with the Purchase Agreement, Parent (the

Purchaser's parent company) has also committed to provide $4.5 million of working capital to the Purchaser to ensure that it is appropriately capitalized to operate the Purchaser's business and increase the value of the Securities.

**B.      Highest and Otherwise Best Offer**

46. I believe that the foregoing procedures were the most appropriate means for soliciting the highest and best offer for the Transferred Assets and that the offer embodied in the Purchase Agreement discussed above is the highest and otherwise best offer.

47. In my opinion, the offer to purchase the Transferred Assets made by Parent and Purchaser, under the terms and conditions set forth in the Purchase Agreement, taking account of both the consideration to be realized from the Sale directly by the Debtors' estates and the indirect benefits of such Sale for the Debtors' creditors: (i) constitutes the highest and otherwise best offer obtained for the Transferred Assets; (ii) is for fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the Transferred Assets being conveyed to Parent and Purchaser; and (iii) would not have been made by Parent and Purchaser absent the protections afforded to Purchaser by the Bankruptcy Code and the proposed Sale Order.  No other person or entity or group of entities has offered to purchase the Transferred Assets for greater value to the Debtors than Parent and Purchaser.

48. I believe the Purchase Agreement negotiations were conducted in a non-collusive, fair, and good faith manner.  Moreover, in my opinion, the sale process afforded a full, fair and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Transferred Assets and to enter into the Transactions.

49. Based on the marketing procedures discussed above, it is my opinion that the Transferred Assets were adequately marketed by the Debtors and Teneo, and the consideration

provided by Parent and Purchaser under the Purchase Agreement constitutes the highest and best offer and provides fair and reasonable consideration to the Debtors for the Transferred Assets and entry into the Transactions. The Purchase Agreement presents the best opportunity to maximize and realize the value of the Transferred Assets. In my opinion, the consideration provided by Parent and Purchaser under the Purchase Agreement constitutes the highest and best offer for the Transferred Assets and constitutes a valid and sound exercise of the Debtors' business judgment.

50. In my opinion, approval of the Sale Motion and the Purchase Agreement and the consummation of the Transactions contemplated thereby are in the best interests of the Debtors, their creditors, their estates, stakeholders, and all other parties in interest. I believe the Debtors have demonstrated good, sufficient, and sound business reasons and justifications for entering into the Transactions and the performance of their obligations under the Purchase Agreement.

51. In my opinion, the Purchase Agreement was not entered into, and none of the Debtors nor Parent or Purchaser has entered into the Purchase Agreement, or proposes to consummate the Transactions, for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors or equity holders. Moreover, I believe neither of the Debtors nor Parent or Purchaser is entering into the Purchase Agreement, or proposing to consummate the Transactions, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws similar to the foregoing.

52. Based on the foregoing, I believe the terms and conditions set forth in the Purchase Agreement, including the form of and total consideration to be realized by the Debtors pursuant

to the Purchase Agreement (i) are in the best interests of the Debtors' creditors and estates, (ii) constitute fair value, full, and adequate consideration, reasonably equivalent value and reasonable market value for the Transferred Assets and (iii) will provide a greater recovery for the Debtors' creditors and equity holders than would be provided by any other practical alternative, including liquidation under chapter 7 or chapter 11 of the Bankruptcy Code.

**C.    Good Faith of Debtors, Parent and Purchaser**

53.  In my opinion, the sales process conducted by the Debtors was at arms' length, non-collusive, in good faith and substantively and procedurally fair to all entities.

54.  As demonstrated above, the Debtors conducted substantial marketing efforts and a competitive sale process, which (a) afforded all creditors and other parties in interest and all potential purchasers a full, fair and reasonable opportunity to submit their highest or otherwise best offer to purchase the Transferred Assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to submit an offer for the Transferred Assets and (c) considered any such offers received.

55.  As further demonstrated above, I believe the Purchase Agreement and the Transactions contemplated thereunder were proposed, negotiated and entered into by and among the Debtors, Parent and Purchaser without collusion, in good faith and at arms' length within the meaning of section 363(m) of the Bankruptcy Code.

56.  To the best of my knowledge, information and belief, neither Parent, Purchaser nor any of their affiliates, present or contemplated members, officers, directors, shareholders or any of its respective successors and assigns is an "insider" of any of the Debtors, as the term "insider" is defined in section 101(31) of the Bankruptcy Code.  I believe the Parent and Purchaser are entering into the Transactions in good faith and are good faith Purchasers within the meaning of section 363(m) of the Bankruptcy Code and are, therefore, entitled to the full

{34528195;4}

protections afforded under section 363(m) and otherwise have proceeded in good faith in all respects in connection with this proceeding.  Moreover, neither the Debtors nor, in my opinion, Parent or Purchaser has engaged in any action or inaction that would cause or permit the Purchase Agreement or the Transactions to be avoided or impose any costs or damages under section 363(n) of the Bankruptcy Code.  Specifically, to the best of my knowledge, information and belief, Parent and Purchaser have not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among any parties or bidders.

**D.**    **Section 363 Is Satisfied**

57. I believe the Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to (i) enter into the Purchase Agreement and (ii) sell the Transferred Assets and assume and assign the Executory Contracts (if any), and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates, and their creditors.

58. I believe the contribution and sale of the Transferred Assets to Parent and Purchaser respectively under the terms of the Purchase Agreement meets the applicable provisions of section 363(f) of the Bankruptcy Code, and except as explicitly provided in the Purchase Agreement with respect to the Assumed Liabilities and Permitted Liens, (i) the transfer of the Transferred Assets to Parent and Purchaser and (ii) the assumption and assignment to Purchaser of the Executory Contracts and Assumed Liabilities will be free and clear of all Liens, Claims, Encumbrances, and interests, and will not subject Purchaser or any of Purchaser's assets to any liability for any Liens, Claims, Encumbrances, or interests or Successor or Transferee Liability (as defined herein), except as provided for in the Purchase Agreement.

59. Parent and Purchaser would not have entered into the Purchase Agreement and would not consummate the Transactions, thus adversely affecting the Debtors, their estates,

{34528195;4}

creditors, and other parties in interest, if the sale of the Transferred Assets was not free and clear of all Liens, Claims, Encumbrances and interests (other than Permitted Liens set forth in the Purchase Agreement) or if Parent and Purchaser would, or in the future could, be liable for any Liens, Claims, Encumbrances and interests except as set forth in the Purchase Agreement, including liabilities that explicitly are not assumed by Parent and Purchaser as set forth in the Purchase Agreement. Parent and Purchaser would not consummate the Transactions unless the Purchase Agreement specifically provides, and this Court specifically orders, that none of Parent, Purchaser, its assets, or the Transferred Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Lien, Claim, Encumbrances, and interests or any Successor or Transferee Liability for any of the Debtors, in each case, other than the Assumed Liabilities and Permitted Liens or as otherwise provided for in the Purchase Agreement.

60.     I do not believe there is any legal or equitable reason to delay the Transactions and good cause exists to promptly consummate the Transactions.

61.     In my opinion, the Debtors have demonstrated (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Transactions pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a chapter 11 plan in that, among other things, absent the immediate consummation of the Transactions, the value of the Debtors' assets will be harmed. To maximize the value of the Transferred Assets, it is essential that the Transactions occur within the timeframe set forth in the Purchase Agreement.

## **CONCLUSION**

62.     Based on the foregoing, the applicable confirmation requirements under 11 U.S.C. § 1129 have been satisfied in these cases. I submit that the Plan complies with all requirements

of chapter 11 of the Bankruptcy Code and that it was proposed in good faith, with the Debtors complying with all applicable provisions of the Bankruptcy Code.  All administrative expense and priority claims are treated in accordance with the requirements of the Bankruptcy Code, and all administrative expenses have already been approved by the Court or are in the process of being approved.  All secured claimants are retaining their liens and shall have same satisfied upon the closing of the sale or as soon as practicable after the Effective Date.  The Plan contemplates a liquidation so it will not be followed by another liquidation or further reorganization.

63.     Moreover, the Plan has been accepted by Class 6 Interest holders, the only impaired class.  Therefore, the Plan may be confirmed under 11 U.S.C. § 1129(a) and (b) as at least one impaired class has voted in favor of the Plan, and all classes are receiving fair and equitable treatment.

64.     I have complied with the United States Trustee's requests in these cases and their chapter 11 guidelines.

65.     The Debtors are current on their United States Trustee's quarterly fees, understand that they will have continued obligations to pay United States Trustee fees as provided under the Plan and will pay those obligations as they become due and owing.

66.     Moreover, the Debtors submit that the Purchase Agreement and the Transactions contemplated thereby are in the best interest of the Debtors, their estates and creditors, and are based upon sound, reasoned and informed business judgment warranting this Court's approval. Based on the foregoing, the Court should grant the Sale Motion and enter the proposed Sale Order annexed thereto.

FURTHER, AFFIANT SAYETH NOT.

_____
Brent C. Williams

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF NEW YORK       )

The foregoing instrument was sworn to and subscribed before me this _20_ day of July, 2015, by Brent C. Williams, who is:

☒    personally known to me; or

☐    produced a driver's license issued by the _____ Department of Highway Safety and Motor Vehicles as identification; or

☐    produced the following identification: _____

_____
NOTARY PUBLIC, STATE OF NEW YORK

_____
(Print, Type or Stamp Commissioned Name of Notary Public)

YVONNE COLON GONZALEZ
Notary Public, State of New York
No. 01GO6284160
Qualified in New York County
Commission Expires June 17, 2017

{34528195;4}

19